HOUSTON & TEXAS CENTRAL RAILWAY COMPANY v.
CHARLES S. HIGGINS.

Decided January 13, 1900.

**1. Railway Company—Duty to Employes in Operating Trains.**

It is a duty of a railway company which it owes to its employes engaged in operating its trains to exercise ordinary care to inform such employes of the whereabouts of other trains upon the track, so as to enable them to guard themselves from injury, and a failure to perform this duty is negligence, and may be so charged by the court.

**2. Same—Contributory Negligence.**

It is not negligence for the conductor of a fast freight train to fail to stop at a station and make inquiries as to a slower freight whose time is then three hours ahead, where the signal displayed at such station means "no orders," and that he could go ahead.

**3. Charge of Court—Request for as Estoppel.**

Where a party, in the court below, requested a charge upon a given issue, he is thereby estopped to complain of the court's charge on such issue on the ground that the court should not have submitted that issue to the jury at all.

**4. Same—"Efficient Cause" of Injury.**

An instruction given that if the engineer's conduct was the "efficient cause" of the collision he could not recover for injuries resulting therefrom, is not materially different from a requested charge that if such conduct "contributed directly and proximately" to the injury, he could not recover.

**5. Same—Rate of Speed—Engineer's Running Orders.**

Orders to an engineer to make twenty-five miles an hour on the entire trip, including stops, do not prohibit him from running at a speed greater than twenty-five miles an hour.

**6. Assignment of Error—Proposition Required.**

An assignment of error that the trial court erred in giving a certain paragraph of the charge, setting it out, but without any proposition following, will not be considered over objections thereto by the opposing party.

APPEAL from Collin. Tried below before Hon. J. E. DILLARD.

*Baker, Botts, Baker & Lovett, R. De Armond,* and *Head, Dillard & Muse,* for appellant.

*Garnett & Merritt and Ewing & Ring,* for appellees.

HUNTER, Associate Justice.—This suit was brought by appellee Higgins to recover damages for personal injuries received by him in jumping from his engine as it was about to run into the rear end of a freight train.

The petition shows that appellee was in the employ of appellant as a locomotive engineer in charge of through extra stock train No. 103, with orders to make twenty-five miles an hour; that the regular freight train No. 7, with which his engine collided, was running in the same direction, but was behind time several hours; that he had run his train by the orders of defendant's train dispatcher, whose orders he was subject to and was bound to obey, and by which he had run his train from the starting point, Houston, and though several telegraph stations intervened between Houston and the place of collision, no instructions were given to plaintiff as to the whereabouts of train No. 7, nor that it was behind time, and plaintiff did not know and had not been informed of his close proximity to said train, but supposed that said train had reached its destination; that at the time of the collision there was a dense fog which prevented the plaintiff from seeing No. 7 until he was too close to avoid the accident; that the injury was caused by the negligence of defendant's train dispatcher in not notifying him that No. 7 was behind time, and of its whereabouts; that the train dispatcher was vice-principal.

The answer was a general denial, and, among the special defenses, that plaintiff was guilty of contributory negligence in that at the time of the injury he was running his train by a station at a high and dangerous rate of speed—forty miles an hour—when his orders were to run at only twenty-five; that he knew No. 7 was immediately in front of him, and carelessly and recklessly and negligently ran his train through Benchley station at a high and dangerous rate of speed, without having it under control, as required by the rules, which were well known to him.

Among the special matters replied, the plaintiff alleged that as he passed Benchley station signals were displayed by defendant's agents notifying him that the track was clear and that he could go on, and that soon after his engine got out of the yard of the station the collision occurred.

The case was tried by a jury, and verdict and judgment rendered for $4375, and hence this appeal.

There is evidence in the record sufficient to sustain all the material allegations in plaintiff's petition. There is also evidence tending to prove that at Bryan, the first station south of Benchley station, the plaintiff was told by the crew of a train he met that No. 7 was just ahead of him, but this evidence is sharply contradicted. The evidence is undisputed that plaintiff did not stop at Benchley station or inquire as to the whereabouts of No. 7, but ran his train through that station at the rate of from twenty-five to thirty-five miles an hour, when at the north end of the yard he ran into No. 7, going north also, and which was then over three hours behind time; but it also establishes that the signal displayed at Benchley was white, which meant no orders, but a clear track and to go on. The agent at Benchley and the train dispatcher at Houston knew that No. 7

was over three hours behind time, and neither notified the plaintiff of this fact, and we conclude he had no notice or knowledge of same until the collision occurred.

We also conclude from the evidence that while there was no rule requiring the train dispatcher to notify plaintiff of the whereabouts of trains with which he was liable to collide, yet, because he knew that at Bryan No. 103 was only ten minutes behind No. 7, and that 103 had orders to and was making twenty-five miles an hour, while No. 7 was allowed to make only sixteen miles an hour, and knew that No. 103 would overtake No. 7 at or before reaching Benchley, it was his plain duty to have telegraphed such orders to both or one of the trains as would have enabled them to avoid the collision; that the injury was caused by the negligent failure of the train dispatcher to give such orders.

The plaintiff was not guilty of any act or omission which contributed to his injury. He supposed, and had the right to suppose, that No. 7 had reached its destination at Hearne more than two hours before the accident occurred, and he supposed there was no other train in his way to obstruct him.

The first assignment of error complains of the following part of the court's charge: "It is the duty of a railway company which it owes to its employes engaged in running and operating its trains to exercise ordinary care to inform such employes of the whereabouts of other trains upon the track, so as to enable them to guard themselves from injury, and a failure to perform this duty would be negligence." The objection is that, according to appellant's manner of conducting its business, it was not the duty of the train dispatcher to give appellee notice as stated in the charge, but it was appellee's duty to acquaint himself of the location of the trains by making seasonable inquiries at the different stations along the road.

We think the charge was correct. It is almost literally copied from the opinion of Justice Brown in the case of Railway v. Stewart, 50 Southwestern Reporter, 335, the companion case to this, and it seems to us sound in every respect as applied to the facts here shown. It is unreasonable to insist on an engineer or train crew stopping at every station along a railroad to inquire of the station agents the whereabouts of the trains, in order to save their lives. It is a matter of common knowledge that railroad trains are operated now in this country under the telegraphic orders of train dispatchers, and it would seem impossible to carry on this dangerous business with any degree of safety or profit without them.

The evidence of defendant's train dispatcher in this case is as follows: "Benchley was not a registering station. The operator from Benchley reported to me by wire. He reported that No. 7 arrived at 9:40 and departed at 9:45. Extra 103 was reported as passing at 9:47. The other train had just been out two minutes. Bryan is the station south of there. No. 7 left Bryan at 9:15. Extra 103 left Bryan at 9:25. It is

eight miles from Bryan to Benchley. The time card limited No. 7 to sixteen miles an hour. They are not to exceed sixteen miles an hour. That includes stops. Going down grades they probably run eighteen or twenty miles. They show up sixteen miles an hour as an average. At Bryan extra 103 was only ten minutes behind them. That was reported to my office. It is eight miles from Bryan to Benchley, and it would take No. 7 half an hour to run it. It would take the special only twenty-two or twenty-three minutes to run it. No, I am mistaken; it would take it only about seventeen or eighteen minutes. I had notice that the special left Bryan only ten minutes behind the other train. I knew it was instructed to make twenty-five miles an hour, and that it would reach Benchley in seventeen minutes after it left Bryan, while the other train would take thirty minutes. I knew at their rates of speed the train behind was bound to overtake the other train before it got to Benchley. I took no precautions to warn those people of their danger. The station just south of Bryan is Welborn. It is eleven miles from Bryan. No. 7 left Welborn at 8:47. Extra 103 left Welborn at 9 o'clock. They were thirteen minutes apart at that place. I did not notify them that this cattle train was behind them. No. 7 was three hours and twelve minutes late at Welborn. I never informed extra 103 that that train was late at all. No. 7 was due to leave Houston at 12:15 at night, and extra 103 at 5:19 in the morning. No. 7 should have been in Hearne at 7 o'clock in the morning, if on schedule time—long before the wreck occurred. They should have left Benchley according to schedule, at 6:25. Extra 103 wasn't on the time card. The train crew of No. 7 were supposed to protect themselves according to the rule from a train coming behind them when they are three hours late and leave a station and have no notice that a train is behind them. Extra 103 was supposed to look out for No. 7 until No. 7 was twelve hours late. That is according to rule 107. They are supposed to look out for a train that has not lost its rights."

How this train dispatcher could sit quietly with his fingers on the key of his telegraphic instrument, with all these facts fresh before him, and, in his mind's eye, watch with undisturbed equanimity this flying train in a dense fog dash into the caboose of the belated, slow train, and crush and mangle the faithful men engaged in the operation of the two trains, when the pressure of his finger would have averted it all, the writer is unable to understand. We are of opinion that his failure to sidetrack No. 7 until 103 could pass it evinces that character of negligence about which there can be no two opinions in the minds of ordinarily prudent men.

There is no merit in the third assignment of error. The fourth complains of the language in which the court submitted the defense of contributory negligence—in having knowledge that No. 7 was close ahead of appellee and in running his train at a high and dangerous rate of speed, as an ordinarily prudent person would not have done; and the court said: "If such conduct upon his part was the efficient cause of the collision of

his train with train No. 7, then you should find for defendant," although you may believe the defendant was negligent, etc.

. Two objections are made to this charge, viz., (1) that the evidence was undisputed that the running of the train at too high a rate of speed was the *efficient* cause of the injury, and it was error to submit this question to the jury; and (2) that it was not necessary to bar a recovery that it should have been the *efficient* cause of the injury, but if *proximately contributed* to causing the injury a recovery was barred.

A special charge was asked by appellant to the effect that if it "contributed directly and proximately to the plaintiff's injury, he could not recover." This requested charge on the point, according to a well-settled rule, estops the appellant from complaining of the first objection; that is, that the court should not have submitted the matter to the jury at all, but the second objection is harder to dispose of.

What is the meaning of "the efficient cause?" We think the jury understood it to mean, and it meant, the cause that effected or brought about the collision. Counsel for appellant contend in the first objection that the evidence is undisputed that it did cause the collision. Well, if it is undisputed that it caused it, where's the error in so treating it? We have concluded that there is substantially no difference in the charge asked on this point and the one given, under the facts of this case. If it "contributed" directly and proximately to the injury, it was the efficient cause; and vice versa, if it was the efficient cause it must have contributed directly and proximately to the injury. The difference, we think, is only a difference in the terms of expression, and is too nice to authorize the reversal of the judgment, though appellant's requested charge was in better terms and form than that given by the court.

The fifth assignment complains of this part of the court's charge: "Negligently failed to comply with this order and ran his train at a much greater speed than twenty-five miles an hour, and that such conduct on his part was the cause of the injury, then you should find for defendant," because the term "*much* is prefixed to "greater," and because it required the jury to believe that such conduct was "*the cause*" of the injury, while it was only necessary for it to *contribute* in causing it. The latter objection is not good, for the same reason given in answer to the first objection to the charge complained of in the fourth assignment of error; and the former is met, we think, by the fact that the evidence shows that the order did not prohibit him from running his train at a greater rate of speed than twenty-five miles an hour, but that he was to make twenty-five miles an hour on the whole trip, including stops, which necessarily required him to make more than twenty-five miles per hour while running, and one phase of the evidence clearly warranted the charge in this form.

The sixth assignment is not well taken, because there was some evidence that appellee had his engine under control as he approached the station and left it, sufficient to authorize the court to submit the issue to the jury. Besides, the meaning of the rule is not clear, and the white signal-board indicated that he should go ahead—no orders.

The assignments from seven to twenty-three, inclusive, complain of the court's action in refusing special charges asked by appellant. Each assignment is relied upon as a proposition. They are all in this form: "The court erred in refusing special charge number 1 requested by defendant, as follows." Then the requested charge is copied in quotation marks. None is followed by a proposition pointing out the supposed error insisted on. Statements of the evidence follow, from which, in some instances, we can understand, we think, what appellant's counsel consider as the error in refusing the charge; but appellee's counsel object to the consideration of any of them because the error is not pointed out as required by the rules number 29 and 30, and we feel constrained to sustain appellee's objections, and decline to consider them. We have, however, had to read them all in order to pass upon the objections, and we found no error in refusing them, and none was pointed out.

The remaining assignments of error relate to the admission of evidence, and assert that the verdict is not supported by the evidence, and we think they are not well taken.

Wherefore, finding no material error in the proceedings, we are of opinion that the judgment ought to be affirmed, and order accordingly.

*Affirmed.*

Writ of error refused.